Filed 8/1/22 In re L.F. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.F., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, Plaintiff and Respondent, v. C.K. et al., Defendants and Appellants. | E078196 (Super.Ct.No. RIJ1900108) OPINION |

APPEAL from the Superior Court of Riverside County. Walter H. Kubelun, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Affirmed.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant C.K.

1

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant J.F.

Teresa K.B. Beecham and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

Defendant and appellant C.K. (Mother) has four minor children: A.G.[1] (female, born 2007); A.A. (male, born 2008) and G.A. (male, born 2011)[2] (collectively, Brothers); and L.F. (female, born 2018; Minor). Minor's father is defendant and appellant J.F. (Father). Brothers and Minor lived with Mother; previously Brothers lived with the maternal grandparents but have also lived with other relatives. Father lived out of state with his older daughter, A.B., and her mother. This appeal pertains only to Minor.

On appeal, Mother contends that the juvenile court's findings and orders at the Welfare and Institutions Code[3] section 366.26 hearing terminating her parental rights to Minor must be reversed. Father joins in Mother's appeal.[4] For the reasons set forth *post*, we affirm.

---

[1] A.G. is not involved in this case since her biological father has primary custody of her; she has lived with him since the "summer of 2018."

[2] The father of A.A. and G.A. is J.A.

[3] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[4] As will be discussed *post*, since we reject Mother's arguments and affirm the juvenile court's findings and orders, and Father's appeal is based solely on Mother's arguments, the findings and orders pertaining to Father are also affirmed.

## FACTUAL AND PROCEDURAL HISTORY

The family came to the attention of plaintiff and respondent Riverside County Department of Public Social Services (the Department) on January 27, 2019, when Mother felt overwhelmed caring for Brothers and Minor. Mother kept Minor with her, but a maternal aunt asked J.A. to take Brothers. Two days later, the Brothers' paternal grandmother took them and refused to return them to Mother because she was "technically homeless." Moreover, "[i]t was said [J.A.], recently moved to reside with the paternal grandmother and he has a history of drug and alcohol abuse and physical abuse towards the children." Later that same day, the Department received another referral that "mother has a history of Methamphetamines use, is using Methamphetamines, and possibly using Heroin. It was said she used Methamphetamines while pregnant with [Minor] and is currently breastfeeding. It was said the mother drives with the children in the vehicle while under the influence and has fallen asleep while driving them to school. Last summer, mother was evicted because of her drug use." When a social worker contacted Minor's paternal grandmother (PGM) she confirmed that she had Minor in her care since January 20, 2019.

Mother told the social worker that she began to use methamphetamine when Minor was three months old. Mother was overwhelmed by her unstable living situation and was unable to find the energy to complete all the tasks required of her. Mother stated that she stopped using methamphetamine on January 20, 2019.

By February 2019, Mother was receiving services through Veterans Affairs; which had helped Mother to obtain housing. Mother was participating in therapy and taking

3

medication. Mother wanted to become stable before having the three children returned to her care.

According to Father, he had been residing in Oregon since October 2018, and paying child support for Minor. Father reported his substance abuse history and stated that he had been sober since October 2018.

In late February 2019 Minor returned to Mother's care. When law enforcement attempted a welfare check thereafter, they did not find Mother at her home. Later, on March 1, when another welfare check was conducted by the police with a social worker present, Mother's property manager unlocked the door. They found Mother crying in her bedroom with Minor and unable to communicate. The police found no drug paraphernalia and Mother confirmed that she was sober. Mother agreed to have PGM watch Minor while Mother entered inpatient treatment at the VA.

On March 7, 2019, the Department moved Minor to a foster home when PGM could not be approved on an emergency basis due to a failed background check. Brothers remained in the care of their father, although they had been removed from him in 2010 due to physical abuse.

On March 8, 2019, the Department filed a section 300 petition for Minor, who was 10 months old at the time. Under section 300, subdivision (b), the petition alleged that Minor had suffered or there was a substantial risk that she will suffer serious physical harm or illness due to Mother's mental health issues including post-traumatic stress disorder and paranoia; the domestic violence history between the parents; and the parents' history of substance abuse. Under section 300, subdivision (g), the petition

4

alleged that Minor had been left without any provisions or support because both parents were unable to provide Minor with care and support.

At the detention hearing on March 11, 2019, the juvenile court made a prima facie finding on the petition and detained Minor. Both parents reported Father was the father of Minor, which was later confirmed by a paternity test.

With regard to the Indian Child Welfare Act (ICWA), Mother indicated on the ICWA-020 form that she may have Native American ancestry through her grandfather. The Department completed the ICWA-030 form and sent notice to the Bureau of Indian Affairs and the Secretary of the Interior. The Bureau of Indian Affairs responded that there was insufficient information to determine tribal affiliation.

On March 22, 2019, the Department filed a first amended petition adding Brothers, and allegations against J.A. The court detained the three children on March 25, 2019; Brothers and Minor were placed in separate foster homes.

Mother indicated she "would love for [Minor] to be placed with her brothers." PGM expressed interest in placement of Minor, but not Brothers. The Department submitted a referral to assess PGM for placement. Mother's case plan included psychotropic medication evaluation and monitoring, psychiatric evaluation, domestic violence and parenting education, mental health services, individual therapy, and substance abuse services.

On May 22, 2019, the juvenile court found the allegations in the petition true, removed physical custody from the parents and ordered family reunification services.

Minor and Brothers remained in separate foster care homes. Minor was meeting her developmental milestones and was physically healthy. Minor saw Brothers during visits with Mother, twice a week for two hours. The three children were bonded and enjoyed playing together. A.A. expressed interest in wanting Minor to live with him. Mother's visits with the three children were consistent. She engaged with them throughout their visits.

During the first six months, Mother relapsed and had difficulty enrolling in an inpatient drug treatment program. She also had difficulty attending her other services. At the six-month status review hearing on November 14, 2019, the court continued reunification services to the parents.

In the 12-month status review report, the Department recommended continued family reunification services to Mother and Father, and termination of services for J.A.

The three children remained in their separate placements. A.A. received intensive therapeutic services due to his behavior, which included aggression and defiance. G.A. got along well with others; he got in occasional fights with A.A. and another male child in the home. Minor was doing well in placement. Mother attended her supervised visits regularly for twice a week, two hours each. She engaged with Brothers and Minor appropriately and was making progress on her case plan.

At the contested 12-month status review hearing on June 17, 2020, the juvenile court continued family reunification services as to Mother and Father. The court terminated services for J.A.

In the 18-month permanency review report filed August 21, 2020, the Department recommended that Minor be returned to Father's care, and that the court terminate Mother's services. Minor had been placed in a confidential placement since March 7, 2019. On July 13, 2020, Minor was placed on an extended visit with Father, who was living at PGM's residence.

The social worker reported that Brothers were doing well in their foster home, and seemed well adjusted. Minor was "well adjusted to residing with her father and paternal family." During the COVID-19 pandemic, the caregivers scheduled weekly video calls between the three children. In-person visitations started again in June of 2022. The three children met and played together; they had telephonic contact with A.G., who lived with her father in San Diego.

On July 10, 2020, unsupervised visits with Mother and the three children were authorized. On July 22, 2020, Mother had an unsupervised visit with the three children and the visit was appropriate. On August 5, 2020, Mother tested positive for methamphetamine and her visits were changed to supervised. She was unable to maintain her sobriety and had not completed her services. Mother was not confident that she could remain sober.

At the 18-month permanency review hearing, the trial court terminated Mother's reunification services for all three children, set a section 366.26 hearing for Brothers, and ordered family maintenance services for Minor and Father. The court reduced Mother's visits to one time a week.

On February 2, 2021, the Department filed a section 387 petition asking the court to remove Minor from Father's custody because he failed to comply with his court-ordered case plan and had relapsed on methamphetamine.

On February 2, 2021, the Department filed a section 387 report recommending the court remove Minor from Father's care due to substance abuse, domestic violence, and failure to engage in services. On January 29, 2021, Minor was placed with PGM and the paternal stepgrandfather (collectively, Paternal Grandparents).

On February 3, 2021, the juvenile court detained Minor from Father. She remained with Paternal Grandparents, whose home had been Minor's home for the majority of her life. Minor continued to do well; she was happy and healthy. Paternal Grandparents met Minor's needs.

Minor and Brothers had been in foster care placement for one year. Paternal Grandparents could not take Brothers; and Brothers' caregivers could not take Minor for placement. Minor continued to have regular visitations with Brothers. Mother attended her supervised visits with the three children and had positive interactions with them. Minor enjoyed Mother's visits, and had appropriate behaviors before and after visits with Mother. On February 16, 2021, however, Minor had difficulty at the beginning of a visit with Mother when PGM tried to leave. PGM reported that Minor continued to have visits with her sisters, A.B. and A.G., who are not dependents of the court.

On March 24, 2021, at the contested section 387 jurisdiction/disposition hearing, the juvenile court found the supplemental allegations true and set the disposition hearing.

On April 13, 2021, the court removed physical custody of Minor from Father, denied him further reunification services, and set a section 366.26 hearing.

On August 11, 2022, at the section 366.26 hearing, the juvenile court continued the hearing for an adoption assessment.

In the section 366.26 postpermanent plan review report, the social worker reported that Minor continued to do well in her prospective adoptive home with Paternal Grandparents. Minor continued to have weekly visits with Brothers, as well as with her parents. She also had frequent contact with A.G. For Minor's third birthday, Paternal Grandparents invited many relatives and family friends to attend Minor's celebration, including both Mother and Father.

Mother continued to have regular visits with Minor, and they were appropriate. PGM indicated that Mother demonstrated her parental role adequately with Minor, making sure Minor's needs were met. Minor was happy and thriving with Paternal Grandparents; they continued to provide a safe space for Minor, and were also cooperative with the Department.

In the preliminary adoption assessment report, the Department recommended that Paternal Grandparents adopt Minor as she was "doing extremely well in the home and [was] extremely bonded to the prospective adoptive parents." Paternal Grandparents were also fully committed to providing Minor with a permanent, stable, and loving home through adoption. Minor continued to do well and progress in their home. At one point, Paternal Grandparents sought therapy for Minor because she had night terrors and behavioral issues after visiting with Mother. Minor would hit and bite other children in

9

her day care. Paternal Grandparents, who had a relationship with Minor prior to her placement with them in January 2021, stated that they would be open to supervised visits with Minor's siblings. Minor on occasion called the Paternal Grandparents "mommy and daddy." Minor reported that she felt safe in the home. She looked to Paternal Grandparents for love, care, and support.

On December 9, 2021, the juvenile court held a section 366.26 hearing. On the morning of December 9, Mother filed a "Request to Change Court Order" (form JV-180) pursuant to section 388 (Section 388 Petition) to provide six months of reunification services. In the Section 388 Petition, Mother's response to the question "What has happened since [the order terminating reunification services on September 8, 2021], that might change the judge's mind," was that she maintained her sobriety, had regular visits with Minor, and was employed. As to the best interests of Minor, Mother contended that she and Minor shared a strong bond, she maintained regular visits with Minor, and she had worked to create an excellent home for Minor. The court held a joint hearing on both matters.

The Department argued that Mother had failed to satisfy the prima facie burden to have an evidentiary hearing on the Section 388 Petition. The Department then submitted on its report and recommendations as to the section 366.26 hearing. Minor's counsel submitted on the Department's recommendation to terminate parental rights and also asked the court to deny the Section 388 Petition. Father's counsel requested that the court select legal guardianship instead of adoption, and to find that the parental benefit exception applied. Mother's counsel requested that the court grant the Section 388

10

Petition. Counsel argued that Mother had maintained stable employment, had regular visitation, and had remained sober for 14 months. Counsel also argued that Mother and Minor shared a strong bond and that Mother had almost completed her case plan.

As to the Section 388 Petition, the juvenile court found that there had been no change of circumstances and denied Mother's petition. The court them terminated parental rights as to both parents. The court found that none of exceptions under section 366.26, subdivision (c)(1)(A & B) applied to the case. The court then found that adoption was in the best interest of Minor. Counsel for the parents requested continued contact with Minor since she was placed with Paternal Grandparents. The court granted the request, at the discretion of the Department and Paternal Grandparents.

On December 9, 2021, Mother filed a timely notice of appeal.

## DISCUSSION

Mother contends that her counsel rendered ineffective assistance of counsel (IAC) at the section 366.26 hearing as her counsel failed to object to any of the Department's recommendations, present evidence, or make arguments to contradict the recommendations at the section 366.26 hearing, except to file the Section 388 Petition.

### A.    LEGAL BACKGROUND

On appeal, we evaluate IAC claims using a two-part test: "In the first step, we examine whether trial counsel acted in a manner expected of a reasonably competent attorney acting as a diligent advocate. If the answer is no, we move to the second step in which we examine whether, had counsel rendered competent service, the outcome of the proceeding would have been more favorable to the client." (*In re Ana C.* (2012) 204

11

Cal.App.4th 1317, 1329-1330; *In re Athena P.* (2002) 103 Cal.App.4th 617, 628; *In re Z.N.* (2009) 181 Cal.App.4th 282, 293.) " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' (*Strickland v. Washington* (1984) 466 U.S. 668, 694.)

Moreover, "[w]e need not examine whether counsel's performance was deficient before examining the issue of prejudice; instead, we may reject a claim of ineffective assistance of counsel if the parent does not show the result would have been more favorable but for trial counsel's failings." (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 261.)

Other than the "rare case where the appellate record demonstrates 'there simply could be no satisfactory explanation' for trial counsel's action or inaction," an IAC claim is properly raised by a petition for writ of habeas corpus. (*In re S.D.* (2002) 99 Cal.App.4th 1068, 1077.) Mother claims that her IAC claim can be filed on appeal because there is "[n]o reasonable tactical purpose [that] could be conceived of for counsel's failure to object to the termination of Mother's parental rights." Because the issue has been fully briefed and because Mother chose to raise the IAC issue via an appeal from her section 366.26 hearing, we review Mother's IAC claim on appeal for the sake of judicial economy and efficiency.

B.     ANALYSIS

Here, Mother argues IAC because her "counsel did not object to any of the recommendations made by the department at [the section 366.26] hearing. [Citation.] Mother's trial counsel did not request a contested hearing, present evidence, or make an

argument contradicting the recommendations, aside from filing a section 388 motion." Mother contends that there was no satisfactory explanation for her counsel's inaction and no reasonable tactical purpose for failing to object to the termination of her parental rights. We disagree with Mother's assessment of her counsel's performance.

In this case, on December 9, 2019, Mother's counsel filed the Section 388 Petition in the morning prior to the scheduled section 366.26 hearing. The court then held a hearing on the Section 388 Petition with the section 366.26 selection and implementation hearing.

At the joint hearing, counsel for the Department submitted on the section 366.26 report filed on July 29, 2021, and the addendum filed on November 24, 2021, and requested the termination of parental rights to free Minor for adoption. Counsel then addressed Mother's petition and requested that the court deny Mother's petition on its face "as she has not [met] the prima facie burden to have an evidentiary hearing."

Minor's counsel also submitted "on the report and the recommendation to terminate parental rights at this time." As to Mother's petition, counsel for Minor stated, "it does not appear that mother has completed her case plan or completed any of the services that were originally ordered for the mother in [her] initial hearing." Minor's counsel noted that Mother did not complete "any additional services or done anything to change the situation" since the court terminated family reunification services in September 2020.

Father's counsel asked for a continuance of the hearing because Father was not present; the court denied the request. Thereafter, Father's counsel submitted on the

13

petition. As to the section 366.26 hearing, counsel objected for the record and asked the court to order guardianship over adoption since Minor was placed with Paternal Grandparents. Father's counsel also stated: "We would ask the Court to find that the exception of 366.26 (c)(1)(B)(1) is applicable and you find that guardianship would be appropriate."

Mother's counsel argued the following: "Your Honor, I'd be asking the Court this morning to grant mother's JV-180. Regarding circumstances being significantly different, it was essentially sobriety that was the issue earlier in this case. Mother has maintained her sobriety now for 14 months. She's more than happy to prove that by way of hair follicle test. She's also maintained stable employment and has connected to peer support groups. She's essentially showing a completely different lifestyle, along with maintaining regular visitation. She's maintained contact with the family in order to arrange visitation. It seems like there has been some issues with being able to contact the social worker.

"Regarding mother's case plan, it seems given mother's sobriety, her organizational skills, and her ability to follow through, there's no reason she wouldn't be able to complete the case plan. And the reason that—the reason that this would be beneficial to the child is several. Mother and child share a strong bond. She maintains that regular visitation. The child knows who their mother is. And there are other children—there are other children in this family. We've seen cases where the lack of closure becomes an issue later on.

14

"Giving the mother, who is in completely different circumstances now, the opportunity to bond with her child on a deeper level will later in [Minor's] life create a closure that wouldn't otherwise be accessible in the same way. In order to optimize her emotional support and well-being and in order to give this family the opportunity that it needs to become a strong unified home, I'm asking the Court to grant mother's JV-180."

Thereafter, counsel for the Department confirmed that Mother had visited regularly, once a week. However, counsel noted that Mother "was provided 18 months' worth of services as to this child prior to the time that her services were terminated in September of 2020." The court then recognized that Mother "was on family reunification essentially from early 2019."

The court then asked Mother's counsel the following: "[Counsel], from early 2019 through September 8th 2020, your client didn't complete her case plan. You now come to me nine months after that—or actually a year after that. Still [you] have no evidence of completion of any portion of the case plan. You do indicate that the mother's sober, but there is no proof attached, and she has been maintaining her weekly visits."

Mother's counsel asked for a moment to speak with Mother. Thereafter, counsel related to the court that Mother completed the majority of her plan, but "it was mainly sobriety that was the issue. There was a relapse in 2020; however, mother claims she largely completed her case plan. The only issue was that relapse."

Thereafter, after hearing from all the parties, the court first denied the Section 388 Petition. The court then immediately moved forward with the section 366.26 portion of

the hearing. No one made additional arguments after the denial of the Section 388 Petition. The court then terminated parents' parental rights.

After reviewing the record in this case, we conclude that Mother failed to demonstrate that her counsel did not act as a reasonably competent attorney based on an objective standard. (*In re Ana C.*, *supra*, 204 Cal.App.4th at p. 1330.) As provided in detail *ante*, we find that Mother's counsel made a rational tactical decision to rely on the strength of the Section 388 Petition, and arguments made by her counsel on the petition. Through the evidence in the petition and counsel's argument, the juvenile court acknowledged Mother's continued and regular visitation, Mother's failure to complete her case plan, and Mother's sobriety. We therefore find that Mother's counsel acted in a manner expected of a reasonably competent attorney acting as Mother's diligent advocate.

Moreover, even if her counsel rendered IAC, Mother has failed to show that a more favorable result was reasonably probable. (*In re Ana C.*, *supra*, 204 Cal.App.4th at pp. 1329-1330.)

First, we find that the parent-child beneficial relationship exception does not apply. For the exception to apply, a parent must show (1) regular visitation and contact with the child; (2) whether the relationship is such that the child would benefit from continuing it; and (3) terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new adoptive home. (*In re Caden C.* (2021) 11 Cal.5th 614, 639-640; § 366.26, subd. (c)(1)(B)(i).)

16

In this case, the record shows that Mother may have been able to satisfy the first two prongs of the beneficial relationship exception. The record, however, does not contain any evidence that terminating the relationship would be detrimental to Minor when balanced against finding permanency via an adoptive home with Paternal Grandparents.

When assessing "whether termination would be detrimental, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 631-632, italics omitted.) The " 'strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home. [Citation.] A child would benefit from continuing a strong, positive, and affirming relationship, and it would be destabilizing to lose that relationship." (*Id.* at p. 632.)

Here, the record shows that terminating the relationship would not be detrimental to Minor when balanced against finding permanency. Hence, even if Mother's counsel raised the parent-child beneficial exception, the outcome would not have been different. Minor had been placed with Paternal Grandparents for 11 months, since January 29, 2021, when Minor was a few months shy of her third birthday. Prior to Minor's placement with Paternal Grandparents, they had already been caring for Minor since her birth in April 2018. Moreover, when Father had family maintenance with Minor, he was

17

residing with Paternal Grandparents and they cared for Minor during that time. In essence, Minor had been residing with Paternal Grandparents—her prospective adoptive parents—for most of her life.

In the addendum report filed for the section 366.26 hearing, the social worker reported that Minor is "doing extremely well in the home and is extremely bonded to the prospective adoptive parents." Moreover, Minor was reported to be happy, to be active, to enjoy spending evenings with her stepgrandfather; and to like playing with toys, her cousins, and her family. Minor expressed feeling safe in the home and would seek out Paternal Grandparents for love, care and support. Minor called the caregivers "mommy and daddy." Paternal Grandparents have been cooperative with the Department and have ensured that Minor is safe and protected. They even sought out therapy for Minor when they observed she was having night terrors and exhibiting aggressive behavior after visiting with Mother. There is no dispute that Mother visited with Minor regularly, and they had a good relationship.

"Yet, the beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent. (*In re Dakota H.* [2005] 132 Cal.App.4th 212[,] 229 [a parent must demonstrate something 'more than frequent and loving contact, an emotional bond with the child, or pleasant visits']; *In re Angel B.* (2002) 97 Cal.App.4th 454, 458 ['for the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt'].) The exception requires the existence ' "of a substantial, positive emotional

18

attachment " between parent and child. ([*In re*] *Caden C.*, *supra*, 11 Cal.5th at p. 632 . . ., quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575[].)" (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 318-319.) Here, Mother has been unable to show that her relationship with Minor was compelling enough to forego adoption. Instead, the evidence showed that although visits between Mother and Minor went well, Minor never cried at the end of the visits or asked to see Mother any other time. Indeed, there is no evidence that Mother's relationship with Minor was more than an "incidental benefit" from positive interactions with Mother, particularly when weighed against the benefit of a permanent home. The exception requires the existence ' "of a substantial, positive emotional attachment" ' between parent and child." (*Id.* at p. 319.) There was no evidence that Minor had a substantial, positive emotional attachment to Mother. Based on the evidence in the record, we find that even if Mother's counsel raised the beneficial relationship exception to adoption, the outcome would not have been different.

Moreover, although Mother's counsel did not raise the beneficial relationship exception, Father's counsel did, as noted *ante*. The court, however, found that it did not apply. The court found that "[t]ermination of parental rights would not be detrimental to the minor in that none of the exceptions contained in WIC 366.26(c)(1)(A) and/or (B) are applicable in this case. Adoption is in the best interest of the child." We bring Father's argument to light because, when compared to Mother, Father had a stronger argument than Mother. Minor had lived with Father from July 2020 to February 2021, and was residing with Father's parents. During the entire dependency, however, Mother only had

one unsupervised visit with Minor. Even given Father's relationship with Minor, the juvenile court found that the parent-child beneficial exception did not apply.

Based on the above, we find that Mother has failed to show that a more favorable result was reasonably probable had her counsel argued that the parent-child beneficial exception applied to Mother.

Next, we find that the sibling-bond exception to the termination of parental rights under section 366.26, subdivision (c)(1)(B)(v), also did not apply to this case. This subdivision provides an exception to the termination of parental rights if the court finds a compelling reason for determining that termination would be detrimental to the child due to a "substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

The juvenile court undertakes a two-step analysis in evaluating the applicability of the sibling relationship exception. First, the court is directed "to determine whether terminating parental rights would substantially interfere with the sibling relationship by evaluating the nature and extent of the relationship, including whether the child and sibling were raised in the same house, shared significant common experiences or have existing close and strong bonds. [Citation.] If the court determines terminating parental

20

rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951-952.) "[T]he concern is the best interests of the child being considered for adoption, not the interests of that child's siblings." (*In re Naomi P*. (2005) 132 Cal.App.4th 808, 822.)

"Reflecting the Legislature's preference for adoption when possible, the 'sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption. It only applies when the juvenile court determines that there is a "compelling reason" for concluding that the termination of parental rights would be "detrimental" to the child due to "substantial interference" with a sibling relationship.' [Citation.] Indeed, even if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 61.) We review the court's finding on this issue for substantial evidence. (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 953.)

In this case, there is no evidence that adoption would substantially interfere with the siblings' relationship. Paternal Grandparents are, and have been, supportive of continued sibling contact. They stated that they would continue sibling contact after the termination of parental rights. As noted *ante*, Paternal Grandparents threw a third birthday party for Minor and voluntarily invited many relatives and family members to

21

attend the celebration, including the parents. Moreover, although Minor has two siblings who are not dependents of the court, the caregivers have ensured and stated that they will continue to ensure Minor has regular in-person contact with them as well. Because the prospective adoptive parents were willing to maintain sibling contact, there was no substantial interference with the sibling relationship. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 254.)

In *In re Daisy D.* (2006) 144 Cal.App.4th 287, the mother claimed that her counsel rendered IAC because counsel failed to raise the sibling exception at the section 366.26 hearing. The court found that the mother's attorney was not ineffective because there was no evidence that adoption would interfere with the siblings' relationship. Moreover, there was no evidence of detriment that the child might suffer if visits ceased. (*Id.* at p. 293.)

Based on the above, even if Mother's counsel had objected to the sibling-bond exception to the termination of parental rights, Mother cannot show prejudice because the outcome would not have been more favorable to Mother.

In sum, we find that Mother's counsel did not render IAC at the section 366.26 and section 388 hearings. Moreover, if we find that Mother's counsel was ineffective, we find the outcome of the proceeding would not have been more favorable to Mother had counsel rendered competent service. Therefore, we affirm the trial court's findings and orders at the hearing on December 9, 2021.

## DISPOSITION

We affirm the findings and orders of the juvenile court.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____

Acting P. J.

We concur:

RAPHAEL _____

J.

MENETREZ _____

J.